UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
Southern Division

SOUTHERN DISTRICT OF MISSISSIPPI
**F I L E D**

AUG 07 2013

J T NOBLIN CLERK
BY_____ DEPUTY

SABU PUTHUKKUTTUMEL VEEDE
KRISHNAKUTTY and THAMPY PUTHAM
PARAMBIL EDICULA,

      Plaintiffs,

vs.

SIGNAL INTERNATIONAL LLC,
INDO-AMERI SOFT L.L.C., KURELLA
RAO, GLOBAL RESOURCES, INC.,
MALVERN C. BURNETT, LAW OFFICES
OF MALVERN C. BURNETT, A.P.C.,
GULF COAST IMMIGRATION LAW
CENTER, L.L.C., SACHIN DEWAN,
and DEWAN CONSULTANTS PVT. LTD.
(a/k/a MEDTECH CONSULTANTS),

      Defendants.

CIVIL ACTION No. 13cv319LG-JMR

**JURY TRIAL DEMANDED**

_____/

## COMPLAINT

    Plaintiffs Sabu Puthukkuttumel Veede Krishnakutty ("Sabu") and Thampy Putham Parambil Edicula ("Thampy") (collectively, "Plaintiffs"), by their undersigned counsel, submit the following Complaint against Defendants Signal International LLC ("Signal"), Indo-Ameri Soft L.L.C. ("Indo-Amerisoft"), Kurella Rao ("Rao"), Global Resources, Inc. ("Global"), Malvern C. Burnett ("Burnett"), the Law Offices of Malvern C. Burnett ("Burnett Law"), Gulf Coast Immigration Law Center ("Gulf Coast Law"), Sachin Dewan ("Dewan") and Dewan Consultants Pvt. Ltd. ("Dewan Consultants") (collectively, "Defendants").[1]

### NATURE OF THE ACTION

    1.   This is a human trafficking, RICO, civil rights, misrepresentation and contract action brought by Plaintiffs, foreign workers trafficked into Mississippi, to recover for the

---

[1] Global, Burnett, Burnett Law, Gulf Coast Law, Dewan, and Dewan Consultants are collectively referred to herein as the "Agents."

unlawful, fraudulent, exploitative and outrageous conduct by Signal, labor brokers Indo-Amerisoft and Rao, Global, Burnett, Burnett Law, Gulf Coast Law, Dewan, and Dewan Consultants. Plaintiffs seek declaratory relief and damages.

2. Defendants conspired and worked together to defraud Plaintiffs out of thousands of dollars, falsely promised them assistance in applying for and obtaining permanent residence in the United States to entice them to pay exorbitant fees to Defendants, trafficked them into the United States, forced them to pay to live in squalid and unsanitary conditions that endangered their health and psychological well-being, discriminated against them on the basis of their race, national origin and alienage, and threatened them with financial ruin and adverse immigration action.

3. In the aftermath of the devastation of Hurricane Katrina, Signal, a marine fabrication company, sought to recruit several hundred foreign workers to work as welders and pipefitters for its Pascagoula, Mississippi, and Orange, Texas facilities. Rather than hiring new workers from the Gulf Coast, Signal instead joined an enterprise that falsely promised Indian men legal permanent residence (referred to as "green cards") to create a ready source of cheap labor. Plaintiffs were 2 of approximately 590 men caught up in this deception.

4. Beginning in 2003, labor brokers Indo-Amerisoft and Rao, and the Agents, hatched a conspiracy and scheme, joined by Signal in 2006, to recruit workers from India, including the Plaintiffs. In printed advertisements and in-person meetings in India, Defendants promised the Plaintiffs that in exchange for "recruitment fees" of approximately $15,000, Defendants would provide Plaintiffs with a job in the United States and assist them in applying for and receiving a green card.

5. Lured by Defendants' fraudulent promises of legal and permanent work-based immigration to the United States for themselves and their families, Plaintiffs plunged themselves and their families into debt to take advantage of these seemingly promising opportunities, selling family treasures and other personal and real property, and incurring significant debt at usurious rates. Plaintiffs did this because they believed they would recoup the expense through the high wages they were promised and through the long-term employment opportunities that would be available to them and their families as permanent residents of the United States. Trusting in the veracity of the immigration and work benefits promised by Defendants, Plaintiffs also relinquished stable employment opportunities in India and in the Persian Gulf.

6. In actuality, Defendants' promises to Plaintiffs were illusory, and knowingly false when made. Defendants had not taken, and had no intention of taking, any steps to assist Plaintiffs in applying for or receiving a green card. To the contrary, Signal, with the knowledge and assistance of the other Defendants, represented to the United States government that it would employ the workers only temporarily, and that the workers would be returned to India "within the year." At no point did Defendants take any steps to assist Plaintiffs in applying for or receiving a green card.

7. Defendants held Plaintiffs' passports and visas, and threatened, coerced, and defrauded Plaintiffs into paying extraordinary fees for recruitment, immigration processing, and travel. Defendants further caused Plaintiffs to believe that if they did not work for Signal under the auspices of temporary, Signal-restricted H-2B guest worker visas, they would suffer abuse or threatened abuse of the legal process, physical restraint, or other serious harm.

8. Upon arrival at Signal's facilities in Pascagoula, Plaintiffs' plight only worsened. Signal utilized psychological abuse, coercion, and fraud to make Plaintiffs afraid and unable

3

to leave Signal's facilities and employ.  Plaintiffs were housed in so-called "man camps" so that they would not mix with the Pascagoula community, enduring prison-like conditions that can only be described as inhumane.  Plaintiffs were among several hundred men crammed into trailer-like bunkhouses that were far too small for the number of men housed therein, and otherwise unfit for human habitation.  Privacy was non-existent.  Toilet and bathing facilities were insufficient.  Food was often rotten.  Signal's private "security guards" patrolled the grounds like prison guards, often preventing the Plaintiffs from leaving the grounds and subjecting Plaintiffs to random searches of their person and belongings.

9.    For the "privilege" of living in prison-like squalor, Signal deducted $35 per day from Plaintiffs' paychecks, seven days a week, which constituted over 34% of their pre-tax earnings.  When workers requested permission to live off-site, they were told by Signal that they could do so, but that Signal would continue to collect the $35 per day.  This compulsory deduction essentially prohibited Plaintiffs from living in more humane conditions.  With 24 men living in a trailer at a time, this amounted to over $25,000 per month per trailer being paid to Signal.

10.   Non-Indian workers were not subjected to such squalid living conditions, degrading treatment, mandatory "man camp" deductions from their paychecks, or extortionate room and board policies.  Plaintiffs also were subjected to unsafe working conditions that non-Indian workers were not subjected to, and were forced to endure anti-Indian invective from Signal personnel, along with threats to deport them if they did not do Signal's every bidding.

11.   Consistent with Signal's unrelenting effort to improve its bottom line by transferring as many costs associated with their employment as possible back onto Plaintiffs, Signal never refunded the "recruitment fees" Plaintiffs had paid in exchange for low-paid

4

work.  Plaintiffs never earned enough money at Signal to make the exorbitant and debt-inducing "recruitment fees" even remotely worthwhile.  Moreover, Signal never compensated Plaintiffs in any way for the physical, emotional, and psychological degradations inflicted upon Plaintiffs.

## JURISDICTION AND VENUE

12.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1595(a), 18 U.S.C. § 1964(c), 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

13.  This Court has personal jurisdiction over all Defendants pursuant to Miss. Code § 13-3-57 and otherwise.  Individually and through their agents, associates, attorneys, or employees, all Defendants have significant contacts with Mississippi.

(a)     Defendant Signal maintains a continuing business presence in Mississippi, including, without limitation, two shipyards in Pascagoula, Mississippi, where the Plaintiffs worked and lived and where much of the wrongful conduct alleged herein occurred.

(b)     Defendant Indo-Amerisoft has substantial business contacts with Mississippi; it traveled to Mississippi in connection with the events described herein (both individually and on behalf of the other Defendants), it committed torts in Mississippi, and it recruited workers and delivered them for employment in Mississippi.

(c)     Defendant Rao has substantial business contacts with Mississippi; he traveled to Mississippi in connection with the events described herein (both individually and on behalf of the other Defendants), he committed torts in Mississippi, and he recruited workers and delivered them for employment in Mississippi.

(d)     Defendant Global is incorporated under the laws of Mississippi, its principal place of business is located in Mississippi, its sole officer and principal (Michael Pol) resides in Mississippi, and it served as Signal's agent to recruit workers and deliver them for employment in Mississippi.

(e)     Defendant Burnett practices law and is registered to vote in Mississippi, he contracted with Global and Dewan Consultants in connection with the scheme alleged herein for acts in whole or in part to be performed in Mississippi, and he served as Signal's agent to recruit workers and deliver them for employment in Mississippi.

(f)     Defendant Burnett Law has offices in Mississippi where much of the legal work in furtherance of Defendants' schemes was performed, and it served as Signal's agent to recruit workers and deliver them for employment in Mississippi.

(g)     Defendant Gulf Coast Law has offices in Mississippi where much of the legal work in furtherance of Defendants' schemes was performed, and it served as Signal's agent to recruit workers and deliver them for employment in Mississippi.

(h)     Defendant Dewan has substantial business contacts with Mississippi; he traveled to Mississippi in connection with the events described herein (both individually and on behalf of the other Defendants), he committed torts in Mississippi, and he served as Signal's agent to recruit workers and deliver them for employment in Mississippi.

(i)     Defendant Dewan Consultants has substantial business contacts with Mississippi; it traveled to Mississippi in connection with the events described herein (both individually and on behalf of the other Defendants), it contracted with Global and Burnett in connection with the scheme alleged herein for acts to be performed in whole or in part in Mississippi, and it served as Signal's agent to recruit workers and deliver them for employment in Mississippi.

14.   Venue is proper in the Southern District of Mississippi under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because much of Defendants' trafficking activity, civil rights violations, fraud, breach of contract, misrepresentations and a substantial portion of the communications, transactions, events or omissions underlying Plaintiffs' claims occurred in and around the Pascagoula area.

**PARTIES**

15.   Plaintiff Sabu is an Indian national, of Indian descent, and is a former H-2B guest worker who was recruited from India by Defendants between 2003 and 2006 and worked at Signal's Pascagoula facility after arriving in the United States on or about November 28, 2006.   Sabu paid Indo-Amerisoft, Rao and/or the Agents the equivalent of approximately $15,000 in "recruitment fees" based on the false promise that they would assist him in applying for and receiving a green card.   Sabu also was forced to pay additional "fees" directly to Dewan, Michael Pol and Burnett as well as fees for skills tests and medical exams. Sabu further incurred transportation expenses each time he was required to travel outside of

his home in Kerala, India to attend a recruitment meeting, deliver payments, or take a skills test or exam. Sabu was subjected to discriminatory, dangerous, and abusive treatment upon his arrival at Signal.

16. Plaintiff Thampy is an Indian national, of Indian descent, and is a former H-2B guest worker who was recruited from India by Defendants and worked at Signal's Pascagoula facility after arriving in the United States on or about November 28, 2006. Thampy paid Indo-Amerisoft, Rao and/or the Agents the equivalent of approximately $15,000 in "recruitment fees" based on the false promise that they would assist him in applying for and receiving a green card. Thampy also was forced to pay additional "fees" directly to Dewan, Michael Pol and Burnett as well as fees for skills tests. Thampy further incurred transportation expenses each time he was required to travel outside of his home in India to attend a recruitment meeting, deliver payments, or take a skills test or exam. Thampy was subjected to discriminatory, dangerous, and abusive treatment upon his arrival at Signal.

17. Defendant Signal is a corporation organized under the laws of Delaware, with facilities in the Gulf Coast region, including Pascagoula, Mississippi. Signal provides marine and fabrication services, including offshore drilling rig overhaul, repair, upgrade and conversion.

18. Defendant Global is a corporation organized under the laws of Mississippi, with its principal place of business in Mississippi, that recruits workers from India for employment in the United States. Michael Pol was, at all relevant times, the President of Global, and resides in Mississippi.[2] Upon information and relief, Pol was, at all relevant times, the sole corporate officer and principal of Global. Pol and Global are alter egos.

---

[2] On or about June 13, 2013, Pol filed for Chapter 7 Bankruptcy protection in the Southern District of Mississippi.

7

19. Defendant Indo-Amerisoft is a corporation organized under the laws of Louisiana that is engaged in the business of recruiting and providing Indian laborers to United States companies and selling opportunities for United States immigration and employment to such laborers.

20. Defendant Rao is the Chairman and Director of Indo-Amerisoft.

21. Defendant Dewan Consultants is a private limited liability company organized under the laws of India.  In 2003 or 2004, Dewan Consultants contracted with Global and Burnett through Gulf Coast Law to identify and recruit Indian workers for employment in the United States on permanent residency visas.

22. Defendant Dewan is the Director of Dewan Consultants.

23. Defendant Burnett is an attorney who maintains offices in Ocean Springs, Mississippi.

24. Defendant Burnett Law is a professional law corporation organized under the laws of Louisiana that maintains offices in Ocean Springs, Mississippi.

25. Defendant Gulf Coast Law is a limited liability corporation organized under the laws of Louisiana that maintains offices in Ocean Springs, Mississippi.  Burnett is the registered agent of Gulf Coast Law, and upon information and belief, Burnett is the sole member, officer or principal of Gulf Coast Law.[3]

26. At all relevant times, Plaintiffs and Defendants were "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(3).

---

[3] Burnett, Burnett Law, and Gulf Coast Law operated as a joint venture and/or alter egos, and will be referred to collectively below as "the Burnett Defendants."

27. At all relevant times, Plaintiffs were engaged in interstate commerce and/or in the production of goods for sale in interstate commerce.

28. At all relevant times, Defendants operated enterprises engaged in interstate commerce or in the production of goods for interstate commerce.

29. Upon information and belief, Defendants Dewan, Dewan Consultants, Global (and its principal Michael Pol) and the Burnett Defendants engaged in a joint venture to conduct and effectuate their shared business interests and activities in the United States.

30. Upon information and belief, the Burnett Defendants, Indo-Amerisoft and Rao engaged in a joint venture to conduct and carry out their shared business interests and activities in India and the United Arab Emirates. This joint venture is in addition to the joint venture described above between the Defendants Dewan, Dewan Consultants, Global and the Burnett Defendants.

31. At all relevant times, Defendants Dewan, Dewan Consultants, Global, and the Burnett Defendants acted as agents of Defendants Signal and/or Indo-Amerisoft and Rao for the purposes of recruiting, obtaining, contracting, transporting and providing Plaintiffs for labor or services.

32. The false promises, collection of exorbitant recruiting fees, and strong-arm tactics of Defendants were, upon information and belief, authorized and/or ratified by Signal, which, in any event, learned in detail of these facts from the very first Indian H-2B workers who arrived at Signal's facilities in the United States as early as late October 2006. Far from taking any corrective measures, Signal ratified and perpetuated the scheme by continuing to facilitate the transportation of further waves of Indian H-2B workers, including Plaintiffs, from November 2006 through April 2007.

9

## SUBSTANTIVE ALLEGATIONS

### *The Initial Recruitment Process*

33. Beginning in 2003 and continuing through at least 2006, Defendants Dewan, Dewan Consultants, and Global placed ads in various newspapers across India and the United Arab Emirates, seeking welders, fitters, and other marine fabrication workers on behalf of various U.S.-based companies and individuals, including Defendants Indo-Amerisoft and Rao.

34. Upon information and belief, Dewan, Dewan Consultants, and Global placed such ads in coordination and agreement with the Burnett Defendants, Indo-Amerisoft and Rao.

35. Upon information and belief, from at least December 2003 through mid-2004, the Agents frequently communicated and consulted via mail, fax, e-mail and telephone to coordinate and direct Defendants' recruitment activities, including advertising efforts on behalf of Indo-Amerisoft and Rao.

36. The advertisements placed by the Agents promised that qualified candidates could obtain legal permanent residence ("green cards") and thereby legally and permanently immigrate to the United States with their families.

### *Plaintiff Sabu's Initial Recruitment*

37. In the fall of 2003, Plaintiff Sabu saw the advertisement placed by the Agents (on behalf of Indo-Amerisoft and Rao) in the *Malayalam Manorama*, a local newspaper, stating that there were opportunities for work in the United States and permanent residency visas. The *advertisement* included a phone number for the offices of Dewan Consultants in Mumbai.

38. Soon after seeing this advertisement, Sabu contacted the offices of Dewan Consultants and spoke directly with Dewan himself. Dewan confirmed the information in the ad regarding both the job opportunity and the opportunity to obtain legal permanent residency ("green card") in the United States. Dewan told Sabu that upcoming informational meetings

were going to be held at the Trident Hotel in Cochin, India and encouraged Sabu to attend if he was interested in the opportunity.

39.   Sabu attended several meetings at the Trident Hotel between November 2003 and January 2004.   At each of these meetings, Sabu and other hopeful Indian workers were promised employment with a reputable U.S. company and a green card in exchange for the payment of approximately $8,250 in "recruitment fees," to be paid in three installments of $2,750.  Sabu was also told at these meetings that he would need to take and pass a practical skills test.

40.   Prior to the first installment payment, Dewan demanded that Sabu deliver $25,000 rupees (approximately $425) to Dewan's associate, "Salimon," to apply for the position with the U.S. company.  Relying on the promise of work in the United States and a green card, Sabu made this payment on December 26, 2003.  Dewan confirmed receipt of this "advance" payment via facsimile.

41.   On or about January 20 or 22, 2004, Sabu attended a meeting at the Trident Hotel where he made his first installment payment for $2,750.00 to Indo-Amerisoft.  Dewan also demanded that Sabu pay to Dewan an additional 37,000 rupees (approximately $629) in cash. Sabu made each of these payments believing that he would be able to recoup these fees through the job opportunity in the United States and the opportunity to obtain permanent residence in the United States.

42.   At the January 2004 meeting, Burnett and Rao also were present.  Dewan acted as the interpreter for Burnett and Rao.  Burnett and Rao re-confirmed the information Sabu had previously received from Dewan regarding the job opportunity, green card application, and the three installment payments.

43. At this meeting, Sabu was told by Dewan, Rao and Burnett that the job opportunity was with Indo-Amerisoft and that the Defendants were going to obtain the green card on his behalf before he traveled to the United States to begin his employment. As an attorney, Burnett's agreement to act on Sabu's behalf, coupled with payment from Sabu for such services, established an attorney-client relationship between Burnett and Sabu and Burnett made no suggestions to the contrary.

44. Sabu was told that if he wanted to bring any family he would need to pay an additional $1,700 "family fee." Sabu did so and made this payment to Dewan after securing a loan from a local community bank.

45. In order to make the first "advance" and installment payments, Sabu initially was forced to sell some of his wife's gold jewelry. Later, he used the remaining jewelry as collateral for a loan with a 12% interest rate.

46. Sabu was told by Dewan, Burnett and Rao that it would only take six months to obtain the initial labor certification. After hearing nothing for nine months, Sabu contacted Dewan by telephone to check on the status of the certification. Dewan assured him that everything was in order and that he should not worry. All the while, his loans were accruing interest.

47. Almost two years after Sabu made the initial payments to Dewan and Indo-Amerisoft, Dewan contacted Sabu in early 2006 and told him that the labor certification had been approved. The second installment payment was tied to Indo-Amerisoft and Rao's receipt of the labor certificate. In a letter dated January 26, 2006, and typewritten on Indo-Amerisoft letterhead, Rao and Indo-Amerisoft offered a $100 discount on the second installment payment as a result of the delay.

48. During the interim, Sabu had obtained steady employment as a pipefitter in Dubai. In order to make the second installment payment, Sabu had to travel from Dubai to Mumbai to make the payment. In addition, Sabu was forced to take out another loan, this time using the land and home owned by his in-laws as collateral.

49. In total, Sabu took out a loan for 3.5 lakh rupees (approximately $5,950) in order to make the installment payments for the recruitment fees.

50. On or about February 13, 2006 Sabu met with Dewan and Rao and made the second installment payment for $2,650 to Indo-Amerisoft. At this time, he also paid an additional 62,000 rupees (approximately $1,054) directly to Dewan.

51. During these meetings, Rao, Burnett and Dewan promised Sabu that he would be paid $18.00 per hour (which would be increased after three months), that the job opportunity was to work for Indo-Amerisoft, that Indo-Amerisoft would provide housing accommodations for a small fee, and, most important to Sabu and the other Indian workers, that he would be arriving in the United States with a green card that would allow him to live and work permanently in the United States.

### Plaintiff Thampy's Initial Recruitment

52. In November of 2003, while on leave from his job in Saudi Arabia, Plaintiff Thampy saw an advertisement in an Indian newspaper from Dewan Consultants offering the opportunity to work and to obtain permanent residency in the United States. The advertisement promised wages of $5,000 per month, significantly more than Thampy was making at his current job for Aramco in Saudi Arabia. Thampy contacted Dewan and an initial meeting was set in December 2003.

53. On December 12, 2003, Thampy met Dewan and Dewan's associate, "Salimon," among others. Dewan explained that Thampy would be making $22 per hour and would

receive a green card within 18 months. Dewan also told Thampy that with this visa, he would be able to bring his family with him to the United States.

54. To complete the process, Dewan told Thampy that he would have to pay three installments of $2,750 to Indo-Amerisoft (or $8,250 total), plus three installments of 75,000 rupees to Dewan (approximately $5,160 total), for a combined cost of approximately $13,410. Additionally, Thampy would have to pay 60,000 rupees (approximately $1,400) for airfare to the United States. In sum, the cost to Thampy would be approximately $14,800.

55. Dewan told Thampy that he should be ready for a subsequent meeting in January where he would be expected to pay the first installment. To raise the funds to pay the first installment, Thampy took a loan from the Bank of Borada for 1.7 lakh rupees (approximately $3,900), using the title to his land as collateral, at a 9.5% per annum interest rate.

56. The meeting was held on or about January 17, 2004, at the Trident Hotel in Cochin. Dewan and Salimon were present, as well as Burnett and Rao. Thampy paid his first installment of $2,750 to Indo-Amerisoft and 75,000 rupees to Dewan at this meeting. After making the payment, Burnett informed Thampy that the green card process would be complete within 18 months and that he would be in touch regarding next steps. As an attorney, Burnett's agreement to act on Thampy's behalf, coupled with payment from Thampy for such services, established an attorney-client relationship between Burnett and Thampy and Burnett made no suggestions to the contrary.

57. Following the January meeting, in February 2004, Thampy returned to his job with Aramco in Saudi Arabia. In the meantime, Thampy repeatedly followed-up with Dewan and Salimon to check on the progress of the green card effort. He routinely was told that his application was on the "fast track." Other than such reassurances, however, there was no apparent progress.

14

58. Over a year later, in approximately June of 2005, Dewan contacted Thampy, informing him that he had "a position" and that he should return to India (from Saudi Arabia) within two months. Relying on this promise of employment, Thampy quit his job in Saudi Arabia, and returned to India in July or August of 2005. Upon his arrival, he immediately contacted Dewan, who said that there was not, in fact, a job for Thampy at this time.

59. Without employment, Plaintiff Thampy was forced to borrow funds to support himself and his family. Thampy was able to borrow 50,000 rupees (approximately $850) from a friend, but desperate for further funds, he borrowed 1.5 lakh rupees (approximately $2550) from a loan shark, known as a "blade company," charging 10% interest per month. Blade companies are different from conventional banks, operating outside the law and engaging in threatening and illegal debt collection practices. Thampy worried that if he was unable to repay the debt to the blade company that the safety of his family could be in jeopardy.

60. Faced with debts that he could not repay, and no real forthcoming employment from Dewan despite his promises, in October or November 2005 Thampy departed for Qatar where he was able to secure employment.

61. In January 2006, Dewan contacted Thampy and informed him that his labor certification had been approved and that his second installment was now due: $2,750 to Indo-Amerisoft and 75,000 rupees to Dewan. Because Thampy was then working in Qatar, he sent his brother-in-law, Varghese Kannampally, to meet with Dewan, Burnett and Rao at the Trident Hotel on February 16, 2006 to pay the second Indo-Amerisoft installment of $2,750. Relying on his friendship with a manager at the Bank of Borado, Thampy borrowed 2 lakh rupees (approximately $3,400), at an interest rate of 9% per annum, to pay Indo-Amerisoft.

62. At the meeting, Burnett and Rao told Thampy's brother-in-law that they were filing the I-140 forms and that Thampy would be going to the United States in 6-9 months. This was confirmed to Thampy by Dewan in a subsequent telephone call. Dewan also sought his second installment of 75,000 rupees, which Thampy wired to Dewan's Dubai office from Qatar, after borrowing the funds from friends.

### Initial Recruitment Allegations Common to Sabu and Thampy

63. Upon information and belief, prior to hosting meetings and testing sessions that included Plaintiffs Sabu and Thampy and others, Indo-Amerisoft, Rao and the Agents conferred in late 2003 and early 2004 by phone, mail, fax or e-mail to organize, plan, and coordinate the logistics, strategy and substantive content of these meetings and testing sessions.

64. In telephone communications, in-person meetings, faxes, contracts, and other written documents transmitted by mail and/or wire in the first half of 2004, Indo-Amerisoft, Rao and/or the Agents personally and through employees, agents and/or associates, told Plaintiffs Sabu and Thampy that if they successfully passed administered skills tests and paid fees totaling approximately 5 to 8 lakh rupees (approximately $12,000 to $20,000), then Plaintiffs would be able to apply for legal permanent resident (green card) status in the United States with Indo-Amerisoft and Rao.

65. In telephone communications, in-person meetings, faxes, written contracts, and/or other written communications, transmitted, upon information and belief, by mail and/or wire, Indo-Amerisoft, Rao and/or the Agents instructed Plaintiffs that the total fees would be paid in a series of approximately three installments.

66. At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted in late 2003 through approximately mid-2004, Indo-

16

Amerisoft, Rao and/or the Agents, personally and/or through their agents, representatives, and/or employees, represented to Plaintiffs that Indo-Amerisoft and Rao were stable and reputable U.S. companies offering lawful and ample employment opportunities, and that Indo-Amerisoft and Rao would obtain for Plaintiffs green cards enabling Plaintiffs to permanently and legally immigrate to the United States with their family members.

67. At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted in late 2003 through approximately mid-2004, Indo-Amerisoft, Rao and/or the Agents, personally and/or through their agents, employees and/or representatives, told Plaintiffs that the green card process, once commenced, would be completed within 18 to 24 months.

68. In such communications with Plaintiffs, Indo-Amerisoft, Rao and/or the Agents further promised to act diligently and do everything necessary to obtain green cards for Plaintiffs in the timelines stipulated.

69. The written communications and other documents provided to Plaintiffs by Indo-Amerisoft, Rao and/or the Agents through the use of mail and/or wire transmissions in and around early to mid-2004, further promised that Plaintiffs would promptly receive a refund of all or nearly all of their payments if Indo-Amerisoft, Rao and/or the Agents did not succeed in securing green cards for Plaintiffs as promised.

70. Indo-Amerisoft, Rao and/or the Agents knew or should have known that they would not refund Plaintiffs' money as promised.

71. Indo-Amerisoft, Rao and/or the Agents induced Plaintiffs to agree to pay them recruitment and other fees, and incur additional related expenses, in exchange for the promise of work and legal residence in the United States without any intention to diligently pursue Plaintiffs' green card applications; knowingly misrepresented, *inter alia*, that the companies

and/or entities purportedly sponsoring Plaintiffs' applications were financially solvent and had reliable and stable employment opportunities to provide Plaintiffs; that the green card applications sponsored by such companies would be valid and bona fide under U.S. immigration law; and that the applications were likely to be successfully completed and approved within the promised timelines.

72. In reasonable reliance on the explicit and repeated promises of Indo-Amerisoft, Rao and/or the Agents regarding green cards, family members' ability to immigrate to the United States, and lawful and legitimate employment opportunities in the United States, Plaintiffs undertook considerable economic, social, familial and personal sacrifices, including payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages, and additional legal fees.

73. When Plaintiffs contacted Dewan, and/or Indo-Amerisoft and Rao by phone, mail, or e-mail at various times between 2004 and mid-2006 to check on the progress of their green card applications, they were assured that the green card process was going forward.

74. While awaiting the processing of their green cards, Plaintiffs continued to accrue substantial interest on the funds that they had borrowed for the purpose of making the initial installment payments to Indo-Amerisoft, Rao and/or the Agents.

75. In or around January 2006, Indo-Amerisoft, Rao and/or the Agents, personally and/or through their agents, employees and/or representatives notified Plaintiffs via telephone, e-mail, or mail communications that the labor certification and paperwork required for their green card application had been approved by the U.S. government.

76. After this notification, Indo-Amerisoft, Rao and/or the Agents used wire and/or mail communications to collect the second installment payments from Plaintiffs.

77. By spring 2006, after the 18 to 24 month processing period promised by Indo-Amerisoft, Rao and/or the Agents had lapsed, Plaintiffs had still not received their green cards.

78. Unbeknownst to Plaintiffs, at that time there actually were no job opportunities at an Indo-Amerisoft facility anywhere in the United States, despite Dewan's, Burnett's and Rao's affirmative and repeated statements that the advertised opportunity for employment and permanent legal residence in the United States was with and through Indo-Amerisoft.

### In the Aftermath of Hurricane Katrina, Signal Joins the Fraudulent Enterprise and Contracts to Bring Workers to the United States.

79. After the devastation caused by Hurricane Katrina in 2005, Signal was presented with both an opportunity and a challenge. The rebuilding effort offered significant potential for new work fixing damaged oil rigs, ships, and other marine platforms. At the same time, however, because the hurricane also destroyed or damaged thousands of homes along the Gulf Coast, including in Pascagoula, some of Signal's workforce had temporarily left the area.

80. In early 2006, Global approached Signal with a purported solution to its problem. At a meeting in January or February of 2006, Global told Signal's Chief Financial Officer Chris Cunningham, Senior Vice President and General Manager Ronald Schnoor, and Vice President of Productions for Mississippi Operations Bill Bingle, that it could deliver first-class fitters and welders from India at no cost to Signal. Global informed Signal that it would work with local immigration attorney Burnett and India-based recruiter Dewan to bring skilled laborers from India. The workers themselves would pay for all costs and fees associated with the recruitment process, immigration processing, and travel to the United States, and Signal would not reimburse the workers for these fees. Signal would pay the workers between $14 and $18 per hour, depending upon skill level.

81. On April 18, 2006, Signal formally joined the Defendants' scheme, executing a document entitled "Skilled Worker Recruitment Agreement" (the "Recruitment Agreement") with Global, authorizing Global to recruit foreign skilled workers for employment at Signal "under the 'H-2B' temporary program and/or the 'permanent residence' process." Pursuant to the Recruitment Agreement, Global agreed to deliver the workers "at no cost to Signal" and further agreed that all other charges, expenses and fees associated with recruitment, transportation, and entry of the foreign workers into the United States would be paid by the workers themselves or by Global, who in turn would be reimbursed through deductions from the wages of Plaintiffs and other workers.

82. On June 19, 2006, Signal executed a power of attorney appointing Dewan Consultants as Signal's "representative in India to facilitate the recruitment of skilled workers to the United States of America" for employment at Signal. The power of attorney authorized Dewan Consultants to advertise, conduct seminars and trade tests, and sign any necessary legal documentation on Signal's behalf.

83. Also in mid-2006, Signal entered into an attorney-client relationship with the Burnett Defendants to advise Signal on immigration issues pertaining to Signal's need for workers. The Burnett Defendants never disclosed this conflict of interest to Plaintiffs. Signal and the Burnett Defendants later memorialized their engagement in a written retainer agreement. Pursuant to that agreement, Signal would not be responsible for any of the Burnett Defendants' legal fees. Rather, under the terms of the agreement, the Burnett Defendants took funds from the "recruitment fees" charged to the workers to pay for the legal services provided to Signal.

84. Signal requested that the Agents secure foreign workers and transport them to the United States as quickly as possible. Signal and the Agents decided that Signal would

sponsor workers on H-2B visas, which could later be extended if Signal needed more foreign labor.

85. In 2006, the Agents placed newspaper advertisements in at least six Indian cities to recruit workers for Signal. Some of the advertisements offered welders and fitters opportunities to go to the United States and obtain H-2B visas or green cards. Other advertisements touted the opportunity for "permanent lifetime settlement in U.S.A. for self and family."

86. In response to these advertisements, in or about April or May of 2006, Plaintiffs Sabu and Thampy each contacted Dewan and Dewan Consultants by telephone, and attended meetings and testing sessions organized by the Agents and their employees or representatives at locations throughout India.

### Defendants File Petitions for Temporary H-2B Visas, Not Green Cards

87. Defendants told Plaintiffs that Signal would sponsor them immediately for a green card to induce them to continue in the scheme to pay large fees to travel to the United States—which had the net effect of defraying nearly all the costs Signal would have had to expend to recruit workers legitimately—and to induce them to continue in the scheme to pay the exorbitant "recruitment fees" far in excess of what would actually be required to obtain H-2B visas or even the promised green cards.

88. Unbeknownst to the Plaintiffs, however, Defendants never filed nor otherwise supported green card applications for Plaintiffs, or took any other steps toward assisting Plaintiffs with securing a green card, and Signal told the United States Department of Homeland Security under penalty of perjury that Signal's need for workers was *temporary*.

89. Written agreements between Plaintiffs, Indo-Amerisoft, Rao and/or the Agents also explicitly promised assistance in applying for and securing a green card—assistance that

Defendants took no steps toward providing.  Dewan Consultants had the workers, including Plaintiffs, sign "memoranda of understanding," which, among other things, informed the workers that "Signal International, LLC has orally promised the Facilitator [Dewan Consultants] . . . that . . . [Signal] will be willing to file and process their employment base [sic.] Green Card."  Dewan Consultants also issued form letters to the workers once they were selected to travel to Signal, informing the workers that Signal "shall proceed with your Green Card for United States of America."

90.  Several Signal employees, including Signal Special Projects Manager John Sanders and Vice-president of Productions for Mississippi Operations William Bingle, traveled to India and attended these sessions.  Sanders also oversaw the immigration interviews and served as contact between Signal and consular officials.

91.  To ensure that their deception remained hidden, Defendants instructed Plaintiffs not to tell United States Department of Homeland Security officials during their forthcoming H-2B visa interview that, in addition to applying for temporary worker status, Signal had promised them that it would sponsor them for a green card.  As Michael Pol explained to Sanders in an August 24, 2006 email:

> Mal[vern Burnett], Sachin [Dewan] or I[ ] needs to be with each and every candidate going into the consulates before their interview [because] [t]hey sometimes say the dumbest things and need to be coached on the proper way to interview. . . . [T]here are some things that should not be known to the consulate personnel, such as the fact that we are going to process them for a green card.  If one of those guys says he is going to the U.S. for immigration and Signal is sponsoring him for permanent residence (green card) . . . he is a goner.

92.  In late May and early June of 2006, the Burnett Defendants, on behalf of Signal, filed with the Mississippi Department of Employment Security, the Texas Workforce Commission, and the United States Department of Labor by mail, electronic transmission, and/or fax the completed forms ETA 750 and attachments seeking permission to import and

hire 590 foreign guestworkers to work for Signal under the auspices of 8 U.S.C. § 1101(a)(15)(H)(ii)(b), attendant regulations 8 C.F.R. § 214.2(h)(6) and 20 C.F.R. § 655.3, and associated administrative letters and/or guidance (commonly known as "the H-2B guestworker program").

93.  Knowing that Signal's labor need was projected to be at least two to three years, Signal and the Burnett Defendants stated in these applications to the state workforce commissions and forms ETA 750 that Signal would employ workers from October 1, 2006, to July 31, 2007.  These applications were furnished with signatures by Signal executives swearing, under penalty of perjury, to the veracity of the information in these applications.

94. The H-2B guestworker program permits U.S. employers to import foreign workers on short-term temporary visas to meet labor needs when employers attest that they cannot find U.S. workers to perform the available jobs.

95.  H-2B visas are non-immigrant visas, are only valid for work with the specific employer listed on the visa, and do not provide portable and/or transferable employment authorization for the visa bearer.

96.  Defendant Signal stated in the ETA 750 forms that its need for H-2B guestworkers was "peak load and a one-time occurrence" and that "the temporary workers will work for the length of the prescribed dates of need, will be paid in accordance with the prevailing wage, and will return to their home country at the end of employment."

97.  In the ETA 750 forms, Defendant Signal named the Burnett Defendants as its agents for the purposes of preparing and submitting these applications to import H-2B guestworkers.  The Burnett Defendants prepared and submitted these applications on behalf of Signal.

98. At the time of filing the ETA 750 forms and attachments with the Mississippi Department of Employment Security, the Texas Workforce Commission, and the United States Department of Labor, Signal and the Burnett Defendants knew that Signal projected the labor need that it sought to fill with foreign workers to be at least two to three years.

99. Signal and the Burnett Defendants, at or around the time they filed the ETA 750 forms in May and June 2006, repeatedly communicated by telephone, mail, e-mail, and/or fax to direct and coordinate recruitment of Indian workers to fill the anticipated H-2B guestworker jobs. Upon information and belief, Signal and/or the Burnett Defendants repeatedly communicated with Dewan, Dewan Consultants, Global, Indo-Amerisoft and Rao by telephone, mail, e-mail, and/or fax to direct and coordinate recruitment of Indian workers to fill the anticipated H-2B guestworker jobs.

100. Upon information and belief, in the course of telephone, fax, e-mail and/or mail communications occurring in or around May or June 2006, Defendant Signal authorized Dewan, Dewan Consultants, and Global to act as their agents in India and the United Arab Emirates for the purposes of recruiting Indian welders and fitters to fill the anticipated H-2B guestworker jobs at Signal operations.

101. Upon information and belief, in the course of these communications, Defendant Signal further authorized Dewan, Dewan Consultants, Global, and the Burnett Defendants to represent that Signal would assume sponsorship of the pending and as-yet-unsuccessful green card applications on behalf of Plaintiffs and other Indian workers.

102. Upon information and belief, in the course of these communications, Defendant Signal further authorized Dewan, Dewan Consultants, Global, and the Burnett Defendants to represent that Signal would apply for at least two to three H-2B visa extensions on behalf of

all the Indian H-2B workers, including Plaintiffs, to allow them to remain in the United States working for Signal while the green card applications were being processed.

103. Signal authorized its Agents to make these representations even though it knew or had reason to know that such visa extensions and green card applications would not be bona fide and valid under United States immigration law.  Moreover, Signal authorized its Agents to make these misrepresentations even though it did not have the intention at that time to apply for such visa extensions and/or green cards on behalf of all of the Indian H-2B workers, including Plaintiffs.

104. In July and August of 2006, the Burnett Defendants, on behalf of Signal, filed with the United States Citizenship and Immigration Service by mail, electronic transmission, and/or fax the completed I-129 forms and attachments seeking 590 H-2B visas for Plaintiffs, among others.

105. Despite knowing that Signal's labor need was projected to be at least two to three years, in these H-2B visa applications Signal attested to a 10-month labor need running from October 1, 2006, to July 31, 2007.  Signal falsely represented to the government that at the end of this 10 month period, it intended to return all H-2B beneficiaries, including Plaintiffs, back to India.  The Burnett Defendants declared that the applications were all based on information of which the Burnett Defendants had knowledge, even though the Burnett Defendants believed that Signal's intentions for these workers, including Plaintiffs, exceeded ten months.

106. In these communications, the Agents falsely assured Plaintiffs that Signal would seek at least two extensions of the temporary H-2B visa with which Plaintiffs would gain admittance to the United States, and that Plaintiffs' H-2B visa would thereafter be converted to a permanent green card.

107. Upon information and belief, Defendants communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed and representations to be made to the worker recruits, including Plaintiffs.

108. In their communications with Plaintiffs, the Agents further failed to disclose material facts regarding the H-2B visa, including the fact that H-2B visas confer only a temporary non-immigrant status that does not allow the bearer to adjust to permanent residency status and the fact that applying for H-2B visa status is fundamentally incompatible with simultaneously applying for a green card.

109. Plaintiffs, unaware of U.S. immigration law and the temporary, nonimmigrant character of H-2B visas and desperate not to forfeit the substantial fees they had already paid, agreed, in reliance on the representations of Indo-Amerisoft, Rao and/or the Agents, to transfer their green card applications from Indo-Amerisoft's to Signal's sponsorship and further agreed to work for Signal under an H-2B visa pursuant to the terms explained by these Defendants.

110. In reasonable reliance on the representations of Defendants, Plaintiffs entered the United States on an H-2B guest worker visas on November 28, 2006, for the purposes of working for Signal at its Pascagoula, Mississippi facility.

111. Plaintiffs would not have paid the extraordinary fees (or incurred such crushingly high, and in some instances, usurious interest) charged by Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, Indo-Amerisoft, and Rao for travel, a green card, visa, and work opportunities, had they known that these Defendants' promises and representations were false.

112. Plaintiffs would not have paid the extraordinary fees charged by Indo-Amerisoft, Rao and/or the Agents for travel, a green card, visa, and employment opportunities, had they

26

known that these Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

### Preparations and Departure for the United States

113. At various times during the spring, summer, and fall 2006, employees of Defendant Signal traveled to various locations in India and the United Arab Emirates and tested the worker recruits', including Plaintiffs' welding and pipefitting skills, in anticipation of employing them in the United States.

114. Plaintiffs paid costs necessary to travel to the cities where these tests were administered.

115. Plaintiffs paid admission fees charged to take these tests.

116. Plaintiffs attended and passed these tests, which were overseen and graded by Defendant Signal's and/or Defendant Dewan's agents, employees, and/or representatives.

117. Upon information and belief, prior to attending these meetings and testing sessions, Defendants Signal, Dewan, Dewan Consultants, Global, and the Burnett Defendants conferred in spring, summer, and fall 2006 by phone, mail, fax and or e-mail to organize, plan, and coordinate the logistics and substantive content of these testing sessions.

118. On or about July 20, 2006 and August 17, 2006, the United States Department of Labor approved Signal's labor certification applications for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

119. In approving these labor certification applications, the United States Department of Labor relied on the accuracy of the applications' stated 10-month period of labor need.

120. Upon information and belief, the Department of Labor is prohibited by its internal guidelines to grant labor certification applications without relying on the application's statement of temporary labor need.

121. In late August and early September 2006, the United States Citizenship and Immigration Service approved Signal's H-2B visa petitions for 590 H-2B workers, including Plaintiffs, for the period of October 1, 2006 through July 31, 2007.

122. In approving these visa petitions, the United States Citizenship and Immigration Service relied on the accuracy of the petitions' stated 10-month period of labor need and the representation that Signal's need was based on a one time peak-load temporary demand.

123. The United States Citizenship and Immigration Service must, according to regulation, rely on the stated period of the petitioner's labor need. *See* 8 C.F.R.214.2(h)(6)(ii)(B) (2006).

124. Defendants knew that the stated period of need in Signal's applications for labor certifications and for H-2B visas were inconsistent with Signal's projected actual labor need and therefore Defendants knew these statements to the government were false.

125. Defendants used the H-2B visas, obtained from the U.S. Government on the basis of false statements by Signal and the Burnett Defendants, to elicit payments of the third installment from Plaintiffs and other Indian workers.

126. Plaintiffs entered the United States on an H-2B guestworker visa, issued by the U.S. Government on the basis of false statements by Signal and the Burnett Defendants, on November 28, 2006, for the purposes of working for Signal at its Pascagoula facility.

127. Around the time of United States Citizenship and Immigration Service's visa approval, Plaintiffs made necessary preparations to travel to the United States on an H-2B visa to work for Signal, including: paying to obtain necessary travel and legal documents; making payments to the United States consulate, Dewan, Dewan Consultants, Global, Pol, Burnett, Indo-Amerisoft and Rao for mandatory H-2B visa and consular processing fees; attending H-

2B visa interviews; and paying Dewan, Dewan Consultants, Global and Pol for travel arrangements.

128. In order to secure an H-2B visa to work for Signal, Plaintiffs were required to be interviewed by the United States Consular offices.

129. This consular interview required that Plaintiffs pay the costs of travel from their home or current place of employment to Madras (Chennai).

130. Defendants required that Plaintiffs sign documents permitting Dewan to receive their visa-stamped passport from the Consulate on Plaintiffs' behalf.

131. During Plaintiffs' consular interviews, the consular officials took Plaintiffs' passports from them.

132. Once Plaintiffs' visas were approved, consular officials sent the passports with H-2B visa affixed, directly to Dewan.

133. Before Plaintiffs could leave for the United States, however, Plaintiffs were required to attend final meetings in Dewan's Mumbai (Bombay) office to make the third installment payments.

134. The meeting took place mere hours before Plaintiffs' scheduled departure to the United States.

135. At these meetings, Dewan, Dewan Consultants, Global, Pol and Burnett collected the final installment payment.

136. Dewan, Dewan Consultants, Global, Pol and Burnett also required that Plaintiffs, who did not proficiently read or speak English, sign English language documents with little or no time for review.

137. Dewan refused to return Plaintiffs' passports—which had been in Dewan's possession since after Plaintiffs' H-2B visas were approved by Consular Officials—until after Plaintiffs had paid the final installments and signed the mandatory paperwork.

138. Notably, it was only at this time that Plaintiffs learned that they would be travelling on a temporary, H-2B visa and not with the promised green card.  When Plaintiff Sabu questioned Dewan about this discrepancy, Dewan assured him that Signal was working to process their green cards and that, in any event, the H-2B visa could be extended twice. Dewan had also assured Plaintiff Thampy that Signal was working to process their green cards.

139. Highly indebted and scared for their family's livelihood if they did not proceed with the job at Signal's operations, Plaintiffs grudgingly went along with this change in the immigration status on the premise that, as promised by Dewan and Burnett, Signal was indeed moving forward and working towards securing the promised green cards.

140. On November 22, 2006 Sabu made the final installment payment for $2,750.00 just hours before getting on a plane to come to the United States.  Sabu was also required to pay $740 directly to Burnett and $2,490 directly to Pol (in addition to the third installment payment).  In order to make these final payments, Sabu had to take out an additional loan at an interest rate that exceeded 12% per annum.

141. Plaintiff Thampy similarly was required to make the third installment payment of $2,750 just hours before departing to the United States and forced to sign numerous documents written in English which were never translated or whose contents were never explained to him.

142. In forceful tones, Dewan, Dewan Consultants, Global, Pol, Burnett or their staff demanded that Plaintiffs quickly sign the mandatory documents, lest they miss the flights to the United States.

143. Plaintiffs had no reasonable opportunity to review, negotiate, or make any changes to the documents presented them.

144. Pursuant to Defendant Signal's instructions and arrangements, approximately 300 workers, including Plaintiffs, were sent to Signal's Pascagoula facility upon arrival in the United States.

145. Plaintiffs had no choice but to pay the fees that Defendants charged to secure employment at Signal's operations.

### Conditions at the Signal Facilities in Pascagoula

146. Upon arrival at Defendant Signal's facilities in Pascagoula, Plaintiffs were shocked to discover that they were expected to live in an isolated, overcrowded labor camp comprised of trailer-like bunkhouses.

147. Defendant Signal's labor camps were located in isolated, industrial areas miles removed from shopping areas, places of worship, and residential communities. These "man camps" were enclosed by fences and accessible only by a single guarded entrance.

148. The labor camp gates were constantly monitored by security guards retained by Defendant Signal. Upon information and belief, some or all of these guards may have been obtained by Signal through the Swetman Security Company.

149. Signal's security guards monitored Plaintiffs' comings and goings by requiring them to show their employee identification badge and recording when Plaintiffs entered and exited the camp. Signal's security guards also searched Plaintiffs' packages and bags when they entered the camp.

150. Except on rare occasions, Plaintiffs were not permitted to receive visitors in the labor camp.

151. Up to twenty-four men were housed in each bunkhouse and made to sleep in two-tiered bunk beds. The bunk beds were so tightly packed in the bunkhouses that it was difficult for Plaintiffs to move about in the narrow passageways between bunks.

152. The Signal labor camp bunkhouses had insufficient toileting and bathing facilities for twenty-four men, resulting in long lines for the bathrooms before and after work shifts.

153. Privacy was non-existent, and Plaintiffs often experienced extreme difficulty sleeping due to the constant noise resulting from the close quarters and the comings and goings of workers who worked on different shifts.

154. Defendant Signal's personnel and/or security guards conducted surprise searches of the dormitory areas of the bunkhouses, including searches of Plaintiffs' personal belongings.

155. Plaintiffs ate meals in Defendant Signal's mess halls, which were only open during limited hours. Due to unhygienic kitchen conditions and rotten food, workers frequently became ill, sometimes requiring hospitalization.

156. Upon information and belief, neither Defendant Signal nor Global obtained the required permit(s) to furnish the board at the Mississippi camp, and the condition and sanitation of the board further violated federal, state, and/or local law including, *inter alia*, the U.S. Food and Drug Administration Food Code, as adopted and modified by Mississippi Department of Health Food Regulations.

157. To add further insult to these unsanitary conditions, Defendants Signal and Global deducted labor camp fees of approximately $35 per day ($245 per week, or

approximately $1,050 per month) from Plaintiffs' paychecks for these  accommodations and meals.

158. When workers complained and asked to live outside the labor camps, Defendant Signal initially refused and subsequently told workers that if they tried to live outside the camps it still would deduct the labor camp fees from their wages.  As a result of these economic realities (combined with the loans already taken out by Plaintiffs), Plaintiffs reasonably felt that they had no choice but to continue living in the Signal camps.

159. Within a few days of Plaintiffs' and other Indian H-2B workers' arrival at Signal's labor camps on November 28, 2006, Signal personnel had conducted meetings at the labor camps between Plaintiffs and representatives from specific banks.  In Pascagoula, these meetings were with representatives from M & M Bank.

160. At the instruction of Defendant Signal, Plaintiffs opened accounts with the designated bank and agreed to directly deposit their wages into these accounts.  Defendant Signal's establishment of Plaintiffs' accounts with this bank gave it unique access to and control over Plaintiffs' funds.

161. Signal employees, management and executives supervising the Pascagoula camp referred to the facility—privately and in professional correspondence to other Signal employees—as "the Reservation," a term adopted from Signal's "shipyard folks."  Another Signal employee was more direct, promising Signal management on April 5, 2007, that if he were placed in charge of the camp, he would not give in to the "misguided notion that some of these Indians can be reasoned with" but would instead "most defiantly [sic] go on a 'rat hunt.'"

162. Defendant Signal only housed Indian H-2B workers such as Plaintiffs in its labor camps.  Upon information and belief, workers of non-Indian descent were neither required nor allowed to live in and/or pay for accommodations in Defendant Signal's labor camps.

163. Defendant Signal subjected Indian H-2B workers such as Plaintiffs to skills testing and re-testing, on-the-job discipline, layoffs, periods without work, lack of safety precautions, unfavorable job assignments, evaluation processes, and other adverse employment actions to which non-Indian and U.S. citizen workers were not similarly subjected.

164. In addition, Signal camp personnel and supervisors frequently used offensive language in speaking with and/or referring to Plaintiffs and other Indian H-2B workers and regularly insulted Plaintiffs and other Indian H-2B workers on the basis of their race, national origin, and/or alienage.

165. During the first week of employing Plaintiffs in the United States, Defendant Signal did not reimburse Plaintiffs for any of the expenses that Plaintiffs were required to incur as a pre-condition of seeking employment with Signal.

166. During the first two weeks of employing Plaintiffs, Defendant Signal deducted approximately $100 to $200 each week from Plaintiffs' checks for job-related tool kits.

167. Conditions were so poor at Signal's Pascagoula facility that, within one month of being at the camp, Plaintiff Thampy complained to the camp manager, John Sanders, about the "jail-like" conditions of the accommodations.  Plaintiff Sabu similarly complained to Signal staff about the poor and rotten food and the deplorable living conditions.  Despite the support of several additional workers, their pleas were ignored.

168. Signal personnel and management regularly threatened Plaintiffs and other H-2B workers that if they did not continue working for Signal, or did not work according to Signal's specifications, Plaintiffs and other Indian H-2B workers would be deported back to India.

169. Unable to earn enough to re-pay the loans they had assumed in their home country, returning to India at that time was simply not an option. In the isolated and guarded atmosphere of the labor camps and grappling with the crushing debt they had incurred to come to the United States, Plaintiffs reasonably felt that Signal's statements were threatening and felt forced to continue working for Signal despite terrible working and living conditions. Plaintiffs were thus subject to a state of economic extortion and imprisonment occasioned by Defendants' collective actions. Leaving meant no job, no way to pay loans undertaken by themselves and family members, the forfeit of theirs and family members' collateral, and potential exposure to severe personal injury for themselves or family members at the hands of the "blade" companies in India. They had no choice but to incur the insults, racial slurs, animal-like treatment, horrible working conditions, inhumane environment, and severe emotional distress occasioned by the concerted actions of Defendants. They stayed, clinging to the repeated promises of a green card, believing that to be the only way out.

170. At regular meetings and in one-on-one or small group conversations with Signal camp personnel and management, some workers voiced complaints regarding the discriminatory treatment to which Indian H-2B workers were subject.

171. When Indian workers voiced grievances regarding housing, food, and wages, Defendant Signal's personnel warned them to stop complaining.

172. When Signal took no action in response to workers' complaints, numerous Indian H-2B workers living at the Pascagoula labor camp began meeting collectively to discuss how

to persuade Signal to improve conditions in its labor camps, and also began meeting with third parties to discuss how best to address their concerns.

173. Defendant Signal became aware of these meetings, including meetings between workers and third parties whom Signal believed to be attorneys.

174. Defendant Signal, through its employees and/or agents, contacted the Agents to express its concerns about worker organizing efforts.

175. Upon information and belief, during these conversations Defendants reached an agreement regarding steps that they would take to discourage further worker organizing efforts and to ensure that the majority of the Indian H-2B workforce continued to work at Signal without complaint, as well as to prevent the Indian H-2B workforce from exercising their legal rights.

176. Upon information and belief, Signal management and camp personnel conferred and plotted internally and with the private Swetman Security firm to respond to workers' organizing activities and to take actions to ensure that the majority of the Indian H-2B workforce continued to work at Signal without complaint, as well as to prevent the Indian H-2B workforce from exercising their legal rights.

177. On or about March 7, 2007, Dewan called one worker's wife at her home in India and warned her that her husband, Sabulal Vijayan, must stop making trouble at Signal.

178. Vijayan's wife informed him of this call, and Vijayan called Dewan on or about March 8, 2007. During that conversation, Dewan told Vijayan that Dewan had learned from Defendant Signal that Vijayan was organizing the workers and making trouble. Dewan told Vijayan that all the workers would be sent back to India if the organizing continued.

179. Vijayan informed other Indian workers, including Plaintiffs, about the calls his wife had received from Defendant Dewan, and word spread quickly through the Pascagoula camps regarding the threats against Vijayan.

180. News about the calls between Defendant Dewan, Vijayan and his wife substantially heightened the reasonable fears of Plaintiffs that if they complained about or tried to leave the discriminatory and substandard working and living conditions at Signal, Defendants would retaliate against Plaintiffs or their families with acts of violence, or by arranging for Plaintiffs' deportation to India.

181. Defendant Signal called a workforce-wide meeting on or about March 8, 2007 in the Pascagoula camp, attended by Signal management and Defendant Burnett.

182. At this meeting, Signal management told Plaintiffs and other H-2B workers that Signal would fight back against organizing efforts by the workers.

183. Signal management further threatened that Signal would not extend Plaintiffs' and all other Indian H-2B workers' visas if any of the workers took legal action against Signal. At that same meeting, Defendant Burnett told the workers that they were ineligible for other kinds of immigration relief and could depend only on Signal to maintain their H-2B immigration status and pursue their green card applications.

184. At or about the same time as this camp-wide meeting in Pascagoula, Signal management made the decision to terminate and forcibly deport Vijayan, and three other Indian workers who had become the "spokesmen" for the Indian H-2B workers at the camp, and to do so by means that would make an example of them for the other Indian workers, including Plaintiffs, in order to keep the remaining workers in line.

185. Early on the morning of March 9, 2007, Signal locked the gate to the Pascagoula labor camp, thereby obstructing the sole means of direct entry to and exit from the camp.

186. Around this same time, Signal camp coordinator Darrell Snyder, and approximately five security guards, some or all of whom were obtained through the private Swetman Security firm, swept through the bunkhouses carrying pictures of the four (4) workers who were to be forcibly deported to India.

187. Security guards began accosting workers to determine whether they were the individuals shown in the pictures.

188. Plaintiffs and other Indian H-2B workers became increasingly frightened and confused by these activities, particularly when word spread that Signal had locked the gate that served as the sole exit from the labor camp.

189. Around 5:15 AM that morning, Vijayan was walking towards the dining area. A security guard and Darrell Snyder, a Signal employee, aggressively confronted Vijayan and instructed him that he was in their custody.

190. Based on the threats made at the meeting on March 8, 2007 and Vijayan's recent phone call with Dewan, Vijayan feared what Defendant Signal might do to him. These feelings, combined with Vijayan's reasonable fear that Snyder and the security guards might physically hurt him, drove Vijayan to attempt suicide. Plaintiff Thampy assisted Vijayan into a vehicle that transported him from the labor camp to a local hospital for immediate medical attention.

191. Other workers were kept under guard in the communal "TV room" and prevented from leaving. These workers also were threatened with termination and deportation to India. These workers were detained in the TV room, under guard, from approximately 6 a.m. for several hours.

192. Several security guards watched over these workers while they were detained. Over the course of several hours, security guards denied these workers' repeated requests to be let out of the TV room, to get something to drink, or to use the bathroom.

193. When other workers attempted to come into the TV room to talk to the three workers kept inside, the security guards pushed them back.

194. Confused and frightened, workers assembled outside the TV room to protest the treatment of the workers detained therein.

195. Around noon, Darrell Snyder and a Pascagoula police officer entered the TV room and the officer questioned why the detained workers were there. Snyder said that these workers had been fired and would be sent back to India.

196. By early afternoon on March 9, 2007, local media, religious advocates, and other individuals had gathered outside the camp gate to express their concern over the attempted suicide of Vijayan and the forced detention of thee other workers.

197. Defendant Signal's actions on and after March 9, 2007 significantly intensified the reasonable fears of Plaintiffs that if they tried to leave Signal's employ or oppose the unlawful and coercive employment conditions at Signal, including by consulting with counsel, they faced the threat of physical restraint, detention, forced deportation, or other serious harms and/or abuses of the legal process.

198. Signal used this horrifying incident to its advantage. In a meeting with the workers days after the attempted suicide, Signal told them that if *any* of the Signal workers filed a lawsuit against Signal, Signal would send *all* of the workers back to India. Plaintiffs understood this to mean that they must remain quiescent and work, lest Signal retaliate and ruin them financially.

199. Having witnessed the events of March 9, 2007, Plaintiffs reasonably feared that they would suffer serious harm, physical restraint, and abuse of legal process if they were to leave Signal's employ.  Deeply indebted, fearful, isolated, disoriented, and unfamiliar with their rights under United States law, Plaintiffs felt compelled to continue working for Signal.

200. Throughout the spring and summer of 2007, Signal personnel in the Mississippi camp held various meetings with the remaining Indian H-2B workers, including Plaintiffs, to discuss the status of their visas and green card applications.

201. Upon information and belief, during spring and summer 2007 Signal personnel conferred with their co-Defendants and co-conspirators via phone and/or e-mail to reach agreement on what should be said to workers attending the meetings.

202. Soon after March 9, 2007, Defendant Signal held a camp-wide meeting in Pascagoula.  Signal personnel told the Indian H-2B workers that Signal would sponsor their green cards if they stayed at Signal and obeyed Signal's rules, and warned that if workers held any meetings against Signal's interests, they would be terminated.

203. During that same time period, Defendants Dewan and Burnett came to the Signal camp and again promised, in the presence of Signal personnel, that Signal, through its attorney Burnett, would make bona fide applications for green cards and obtain several H-2B visa extensions for the Indian H-2B workers who had not been terminated by Signal. Plaintiffs reasonably believed these promises.

204. In meetings and conversations in spring and summer 2007, Defendant Signal, through its agents and employees at the Pascagoula facility, continued to promise that Signal would arrange for the H-2B visa extensions and green cards originally promised to Plaintiffs when they were recruited in India.

205. Plaintiffs' continuing dependence on Signal for their present and future immigration status their continuing high levels of indebtedness and unfamiliarity with United States law, reasonably led Plaintiffs to fear serious harm and/or abuse of the legal process if they left Signal's employ.

206. Under such circumstances, Plaintiffs reasonably felt like they had no choice but to continue working for Signal.

207. At various times relevant to Plaintiffs' claims, Defendant Signal refused to confirm whether valid H-2B visa extensions had in fact been obtained for Plaintiffs, coercing Plaintiffs to continue working for Signal in the hope that Signal would finally resolve their uncertain immigration status.

208. After working for Signal for almost one year and not having received the promised green card, Plaintiff Sabu and other Indian workers contacted Rao regarding their immigration status. In late 2007, Sabu and other workers met with Rao's wife and an attorney, Kristie L. Bowerman, at a Super 8 Motel in Pascagoula. Sabu was told at this meeting that Rao would continue to help the workers with the processing of their green cards and I-140 applications, but that they would need to pay additional monies to Rao and to the attorney for this work.

209. Plaintiff Sabu paid an additional $2,200 to the "Immigration Nationality Law Group" based on the representations made by Rao. On or about February 19, 2008, Rao instructed Sabu to meet him at a Wal-Mart in Pascagoula and deliver an additional $400. Rao represented to Sabu that this was another payment needed to process his visa and I-140 application. Sabu, feeling helpless and deeply in debt, made each of these payments based on the misrepresentations of Rao and the other Defendants that this was the only way he could remain and work in the United States.

41

210. After nearly a year enduring the horrid conditions in the Pascagoula facility, Plaintiff Thampy ultimately realized that Defendants' promises of permanent residency were illusory. Afraid that company managers would deport him if they knew his intentions, Plaintiff Thampy escaped the Pascagoula camp on October 7, 2007, with the assistance of his fellow workers.

211. Plaintiff Sabu, however, feeling crushed under the weight of massive debt in India, felt compelled to continue working for Signal until he was terminated in December 2008. At that time, without any concern for the debts incurred by the Indian workers in their home country, Signal terminated Sabu and other Indian workers and fraudulently promised to seek another extension of their H-2B visas so that they could return and resume their employment with Signal. This of course was another false promise.

212. Since first contracting with Defendants in India, Plaintiffs have yet to receive from Defendants the green cards Defendants promised to them. Despite clear contractual provisions requiring them to do so, Defendants have refused to refund any of the moneys Plaintiffs paid to them for unsuccessful green card and visa processing.

213. Since first contracting with Defendants in India, Plaintiffs have had to seek other legal counsel to assist them in pursuing green card applications and other immigration relief, thereby incurring thousands of dollars in additional legal fees and costs which have not been reimbursed by Defendants.

## FIRST CLAIM FOR RELIEF

### THE TRAFFICKING VICTIMS PROTECTION ACT OF 2003
**18 U.S.C. § 1589 (forced labor) and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor)**

*(All Defendants)*

214. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

215. Plaintiffs bring these claims against all Defendants.

216. Plaintiffs are authorized to bring these claims pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595 ("TVPA").

217. In 2000, Congress enacted the TVPA to provide enhanced legal protections for victims of human trafficking and to supplement existing forms of relief.  Congress specifically included protections for persons forced to work out of fear of serious harm, physical restraint, abuse of the legal process, or threats of the same.

218. According to House Report 106-939, the new forced labor statute was "intended to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence."  In particular, Congress clarified that the statute covered "a broad array of harms, including both physical and nonphysical," and could apply where the perpetrator "intentionally caus[ed] the victim to believe that her family [would] face harms such as banishment, starvation, or bankruptcy in their home country."

219. In 2003, Congress amended the statute to permit individual victims of trafficking to bring civil claims against their traffickers.

43

220. Defendants attempted to and did subject Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.

221. Defendant Signal knowingly attempted to and did physically restrain or threaten Plaintiffs with serious harm in order to obtain the labor and services of Plaintiffs in violation of 18 U.S.C. § 1589(1).

222. Defendants knowingly attempted to and did obtain the labor and services of Plaintiffs using a scheme, plan, or pattern which, under the totality of the circumstances, was intended to coerce and did coerce Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of Defendant Signal in violation of 18 U.S.C. § 1589(2).

223. The scheme to isolate Plaintiffs, to coerce them to live in conditions causing psychological harm, and to limit their outside contacts, including unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to convince Plaintiffs that they would suffer serious harm if they were to leave the employ of Defendant Signal.

224. Defendants retaliated against Plaintiffs for attempting to exercise their legal rights, threatened Plaintiffs with deportation and deceived Plaintiffs about the terms of their immigration status in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(3).

225. Defendants knowingly recruited, transported, harbored, provided, and/or obtained Plaintiffs so as to obtain their labor and services in violation of laws prohibiting peonage, slavery, involuntary servitude, and forced labor within the meaning of the provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590.

226. In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants knowingly recruited, transported, harbored and/or

obtained the Plaintiffs for labor or services in furtherance of these Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

    a.    enticing, persuading, or inducing Plaintiffs to go on board an airliner and to go to various locations throughout India and the United States with the intent that they may be made or held in modern-day slavery, violating 18 U.S.C. § 1583;

    b.    knowingly and willfully holding Plaintiffs to involuntary servitude, as defined by the TVPA, 22 U.S.C. § 7102(5)(a) and (b), violating 18 U.S.C. § 1584;

    c.    removing, confiscating, or possessing Plaintiffs' passports and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1592(a); and

    d.    attempting to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1594(a).

227. As a proximate result of the conduct of Defendants, Plaintiffs have suffered injuries to their person, business, and property, and other damages.

228. Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d)

#### (All Defendants)

229. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

230. Plaintiffs' RICO Case Statement, filed concurrently herewith, is incorporated herein by reference.

231. Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), are brought against all Defendants.

232. Each Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

233. Each Defendant is a "RICO person" within the meaning of 18 U.S.C. § 1963(1).

234. All Defendants and the United States Consular officers in India constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1964(4) ("RICO Enterprise I").

235. Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, and Signal constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1964(4) ("RICO Enterprise II").

236. Dewan, Dewan Consultants, Global, Pol, Defendant Signal, the Burnett Defendants, Swetman Security, and M & M Bank constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1964(4) ("RICO Enterprise III").

### The RICO Enterprises

### RICO Enterprise I

237. RICO Enterprise I is an ongoing business relationship between all Defendants and the United States Consular officers in India, with the common purpose of recruiting, transporting, providing, processing, and obtaining foreign workers to work on shipyards in the United States, including on Signal's operations in Texas and Mississippi.

238. RICO Enterprise I is engaged in interstate commerce in that its activities and transactions relating to the international and interstate movement of workers affect interstate commerce and frequently require travel and communications across state and international lines.

239. The members of RICO Enterprise I function as a continuing unit.

240. Defendants conducted or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise I through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by

their common goal to recruit, obtain, transport, process, and provide workers through the use of fraudulent promises, exorbitant fees, forced labor, and/or trafficking.

241. Defendants conducted or participated in and/or conspired to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

a.   Enticement into modern day slavery in violation of 18 U.S.C. § 1583;

b.   Involuntary servitude in violation of 18 U.S.C. § 1584;

c.   Forced labor in violation of 18 U.S.C. § 1589;

d.   Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C § 1590;

e.   Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

f.   Mail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341;

g.   Wire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343; and

h.   Immigration document fraud in violation of 18 U.S.C. § 1546.

### RICO Enterprise II

242. RICO Enterprise II is an ongoing business relationship between Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, and Signal with the common purpose of selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and to travel to the United States to work for companies, including Signal.

243. The members of RICO Enterprise II operate as a continuing unit.

244. RICO Enterprise II is engaged in interstate commerce in that its activities and transactions relating to the sale of United States green cards, visas, and job opportunities affect interstate commerce.

47

245. Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, and Signal conducted or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise II through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to sell United States green cards and work opportunities to Indian workers for the purposes of furnishing such workers for employment at Signal's operations.

246. Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, and Signal conducted or participated in the affairs of RICO Enterprise II by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

    a.    Enticement into modern day slavery in violation of 18 U.S.C. § 1583;

    b.    Involuntary servitude in violation of 18 U.S.C. § 1584;

    c.    Forced labor in violation of 18 U.S.C. § 1589;

    d.    Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C § 1590;

    e.    Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

    f.    Mail fraud in violation of 18 U.S.C. § 1341;

    g.    Wire fraud in violation of 18 U.S.C. § 1343; and

    h.    Immigration document fraud in violation of 18 U.S.C. § 1546.

### RICO Enterprise III

247. RICO Enterprise III is an ongoing business relationship between Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, Signal, Swetman Security, and M&M Bank with the common purpose of providing and maintaining a consistent and acquiescent labor force at Signal operations.

248. RICO Enterprise III is engaged in interstate commerce in that its activities and transactions relating to maintaining and providing a consistent labor force at Signal occurred

across state and international lines, and involve wages and working conditions at an employer engaged in interstate commerce (Signal).

249. The members of RICO Enterprise III function as a continuing unit.

250. Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, and Signal conducted or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise III through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to maintain a consistent and acquiescent H-2B Indian labor force at Signal through the use of fraudulent promises, forced labor, and trafficking.

251. Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, and Signal conducted or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise III by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

    a.    Enticement into modern day slavery in violation of 18 U.S.C. § 1583;

    b.    Involuntary servitude in violation of 18 U.S.C. § 1584;

    c.    Forced labor in violation of 18 U.S.C. § 1589;

    d.    Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C § 1590;

    e.    Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

    f.    Mail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341;

    g.    Wire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343; and

    h.    Immigration document fraud in violation of 18 U.S.C. § 1546.

## Predicate Acts

### Enticement into Slavery: 18 U.S.C. § 1583

252. Signal, Global, Pol, Indo-Amerisoft, Rao, Dewan, Dewan Consultants, and the Burnett Defendants, through Enterprises I, II, or III, willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of enticement into modern-day slavery in violation of 18 U.S.C. § 1583, and as set forth in Plaintiffs' First Claim for Relief.

### Involuntary Servitude: 18 U.S.C. § 1584

253. Signal, Global, Pol, Indo-Amerisoft, Rao, Dewan, Dewan Consultants, and the Burnett Defendants, through Enterprises I, II, or III, willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of involuntary servitude in violation of 18 U.S.C. § 1584, and as set forth in Plaintiffs' First Claim for Relief.

### Forced Labor: 18 U.S.C. § 1589

254. Signal, Global, Pol, Indo-Amerisoft, Rao, Dewan, Dewan Consultants, and the Burnett Defendants, through Enterprises I, II, or III, willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of forced labor in violation of 18 U.S.C. § 1589, and as set forth in Plaintiffs' First Claim for Relief.

### Trafficking for the Purposes of Forced Labor and/or Involuntary Servitude: 18 U.S.C. § 1590

255. Signal, Global, Pol, Indo-Amerisoft, Rao, Dewan, Dewan Consultants, and the Burnett Defendants, through Enterprises I, II, or III, willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of trafficking for the purposes of forced labor and/or involuntary servitude in violation of 18 U.S.C. § 1590, and as set forth in Plaintiffs' First Claim for Relief.

## Document Servitude: 18 U.S.C. § 1592

256. Signal, Global, Pol, Indo-Amerisoft, Rao, Dewan, Dewan Consultants, and the Burnett Defendants, through Enterprises I, II, or III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of document servitude in violation of 18 U.S.C. § 1592, and as set forth in Plaintiffs' First Claim for Relief.

## Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

257. Defendants, through RICO Enterprise I, made and/or conspired to make false promises regarding green cards and other benefits in a scheme calculated to defraud Plaintiffs out of large sums of money.

258. Signal, Global, Pol, Indo-Amerisoft, Rao, Dewan, Dewan Consultants, and the Burnett Defendants, through Enterprises I, II, or III, made and/or conspired to make false statements related to applications submitted to the U.S. Government for H-2B visas and false promises to Plaintiffs regarding green cards and other benefits in a scheme calculated to defraud Plaintiffs out of large sums of money.

259. Defendants, through RICO Enterprise I, used the mails and wire communications, including communications via telephone, fax, internet and/or e-mail, on numerous occasions to further these fraudulent schemes.

260. Signal, Global, Pol, Indo-Amerisoft, Rao, Dewan, Dewan Consultants, and the Burnett Defendants, through Enterprises I, II, or III, used the mails and wire communications, including communications via telephone, fax, internet and/or e-mail on numerous occasions to further this fraudulent scheme.

261. These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

### Immigration Document Fraud: 18 U.S.C. § 1546(a)

262. Defendants, through RICO Enterprise I, fraudulently sold and/or conspired to sell H-2B visa extensions and green cards to Plaintiffs despite Defendants' awareness that applications for these H-2B visa extensions and green cards were not bona fide or lawful under United States immigration law.

263. Defendants, through Enterprises I, II, or III, obtained, accepted, and/or received a 1-1-213 visa despite knowing this visa to have been procured through false statements and/or fraud on the U.S. Government.

264. Defendants Dewan, Dewan Consultants, Global, Pol, the Burnett Defendants, and Signal, through RICO Enterprises I, II, and III, fraudulently sold and/or conspired to sell H-2B visa extensions and green cards to Plaintiffs despite Defendants' awareness that applications for these H-2B visa extensions and green cards were not bona fide or lawful under United States immigration law.

265. These willful, knowing, and intentional acts constitute immigration document fraud in violation of 18 U.S.C. § 1546(a).

### Pattern of Related Racketeering Acts

266. Defendants engaged in the racketeering activity described herein repeatedly starting in 2003 and continuing at least through January 2009 with respect to approximately 590 Indian workers.

267. Upon information and belief, Signal sought new Indian H-2B workers for employment at Signal who may be subject to similar racketeering activities.

268. Defendants, though the RICO enterprises, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

269. Defendants' racketeering acts have or had similar purposes: to profit from the fraudulent recruitment and forced labor of Plaintiffs and other Indian workers, and to recruit, obtain, provide and maintain a consistent, submissive, and compliant Indian H-2B guestworker labor force at Signal's operations.

270. Defendants' acts yielded similar results and caused similar injuries to Plaintiffs, including payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages, and additional legal fees.

271. As set forth in the preceding paragraphs and Exhibit 1, the racketeering acts have or had similar participants.

272. As set forth in the preceding paragraphs and in Exhibit 1, Defendants, though the RICO enterprises, directed their racketeering activities at similar victims: Indian workers who contacted Dewan and Dewan Consultants in search of green cards, economic opportunity, and stable employment in the United States.

273. Defendants' acts have or had similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from Plaintiffs and other Indian workers, and use of similar employment practices and policies with respect to Plaintiffs and other Indian workers.

## Injury

274. As a direct and proximate result of Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs have suffered injuries to their property and/or business, including but not limited to: exorbitant fees paid by Plaintiffs for a green card, visa and other immigration and recruitment-related services; interest on debts assumed by Plaintiffs to pay such fees; losses of personal and real property incurred in reliance on

Defendants' fraudulent acts; lost and unpaid wages, lost employment opportunities, and other pecuniary and/or losses to real or personal property.

275. Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF

### VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981 (Discriminatory Treatment)

#### *(Signal)*

276. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

277. Plaintiffs assert this claim pursuant to 42 U.S.C. § 1981 for declaratory relief and damages against Defendant Signal.

278. The actions of Defendant Signal, as set forth herein, violated Plaintiffs' rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Plaintiffs' rights to enjoy and benefit from non-discriminatory employment relationships with Signal.

279. Defendant Signal subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at Signal labor camps.

280. Defendant Signal did not subject its non-Indian and/or U.S. citizen employees to the same or similar room and board arrangements.

281. Defendant Signal also imposed discriminatory job-related requirements and adverse terms and conditions of employment to which non-Indian and/or U.S. citizen employees were not similarly subject.

282. Defendant Signal maintained an objectively hostile and abusive work environment on account of Plaintiffs' race, national origin, and/or alienage through the actions

54

and statements of its personnel referring to and/or directed at Plaintiffs and other Indian H-2B workers.

283. As set forth in the preceding paragraphs, Defendant Signal's discriminatory and offensive treatment of Plaintiffs was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. § 1981.

284. Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race, national origin, and/or alienage.

285. Defendant Signal's hostile, abusive, and discriminatory treatment of Plaintiffs was unwelcome.

286. Defendant Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs of their rights.

287. As a result of Defendant Signal's unlawful acts, Plaintiffs have suffered injury to their property and/or persons.

288. Plaintiffs seek all appropriate relief, including declaratory relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### VIOLATIONS OF THE KU KLUX KLAN ACT OF 1871
### 42 U.S.C. § 1985 and the Thirteenth Amendment

#### (All Defendants)

289. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

290. Plaintiffs assert this claim pursuant to 42 U.S.C. § 1985(3) for declaratory relief and damages against all Defendants.

291. As set forth in the preceding paragraphs and Plaintiffs' First Claim for Relief, Defendants, along with non-defendants, including Pol, the Swetman Security firm and M & M Bank, conspired, agreed, planned and coordinated for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (*inter alia*, 18 U.S.C. §§ 1589, 1590) to be free from forced labor, involuntary servitude, and trafficking in persons.

292. Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Plaintiffs of their rights and/or acted in furtherance of a conspiracy to deprive Plaintiffs of their rights.

293. Defendants knowingly, willfully, maliciously, intentionally, and without justification planned and acted to deprive Plaintiffs of their rights.

294. As a result of the unlawful acts of Defendants, Plaintiffs have suffered damages.

295. Plaintiffs seek all appropriate relief, including declaratory relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### FRAUD

### (All Defendants)

296. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

297. As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees, and/or representatives, knowingly made materially false statements and representations to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

298. As set forth in the preceding paragraphs, Defendants knowingly failed to disclose material facts to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

299. Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay the exorbitant fees requested by Dewan, Dewan Consultants, Indo-Amerisoft, Rao, Global, and/or the Burnett Defendants.

300. Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay exorbitant fees to Indo-Amerisoft, Rao and/or the Agents, and to leave their homes and jobs in India and the United Arab Emirates and travel to the United States to work for Signal.

301. Plaintiffs were entitled to rely on Defendants' representations.  At the time the representations were made, Plaintiffs did not know or have any reason to know that the representations were false.

302. Relying on Defendants' false representations regarding green cards and employment opportunities, Plaintiffs paid large sums of money to Indo-Amerisoft, Rao and/or the Agents.

303. Relying on Defendants' false representations regarding green cards and employment opportunities, Plaintiffs incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by Defendants and their agents, employees and/or representatives.

304. Relying on Defendants' false representations regarding green cards and employment opportunities, Plaintiffs sold personal and real property and surrendered employment opportunities in India.

305. Relying on Defendants' false representations regarding green cards and employment opportunities, Plaintiffs left their homes and jobs in India and traveled to the United States to work for Defendant Signal.

306. As a direct and proximate result of Defendants' knowing, willing, and intentional actions, statements and omissions, Plaintiffs have been injured.

307. Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

## NEGLIGENT MISREPRESENTATION

### (All Defendants)

308. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

309. As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees, and/or representatives, negligently made materially false statements and representations to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

310. As set forth in the preceding paragraphs, Defendants negligently failed to disclose material facts to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

311. Defendants intended that the false or misleading statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay the exorbitant fees requested by Indo-Amerisoft, Rao and/or the Agents.

312. Defendants intended that the false or misleading statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay

exorbitant fees to Indo-Amerisoft, Rao and/or the Agents, and to leave their homes and jobs in India and the United Arab Emirates and travel to the United States to work for Defendant Signal.

313. Plaintiffs were entitled to rely on Defendants' representations. At the time the representations were made, Plaintiffs did not know or have any reason to know that the representations were false.

314. In reasonable reliance on Defendants' false or negligent representations regarding green cards and employment opportunities, Plaintiffs paid large sums of money to Indo-Amerisoft, Rao and/or the Agents.

315. In reasonable reliance on Defendants' false or negligent representations regarding green cards and employment opportunities, Plaintiffs incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by Defendants and their agents, employees and/or representatives.

316. In reasonable reliance on Defendants' false or negligent representations regarding green cards and employment opportunities, Plaintiffs sold personal and real property and surrendered employment opportunities in India.

317. In reasonable reliance on Defendants' false or negligent representations regarding green cards and employment opportunities, Plaintiffs left their homes and jobs in India and traveled to the United States to work for Defendant Signal.

318. As a direct and proximate result of Defendants' knowing, willing, intentional, and/or negligent actions, statements and omissions, Plaintiffs have been injured.

319. Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

#### *(All Defendants)*

320. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

321. As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees and/or representatives, offered to obtain permanent residence and immigration status for Plaintiffs in the United States, as well as steady work opportunities in the United States with Defendant Signal and/or Indo-Amerisoft and Rao in exchange for Plaintiffs' payment of exorbitant fees to Defendants and their employees, agents and/or representatives and agreement to work for Defendant Signal and/or Indo-Amerisoft and Rao.

322. Plaintiffs accepted Defendants' offers, paid the agreed upon fees, and performed the agreed-upon work.

323. Defendants breached their contracts with Plaintiffs by failing to comply with their binding promises regarding permanent residence and immigration status.

324. In reliance on these agreements, Plaintiffs paid large sums of money and entered into substantial debt, surrendered other employment opportunities, and incurred other financial losses.

325. As a direct, probable and foreseeable result of Defendants' breaches, Plaintiffs have suffered damages.

326. Plaintiffs are entitled to recover compensatory damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

## MONEY HAD AND RECEIVED

### *(All Defendants)*

327. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

328. Plaintiffs bring this claim against all Defendants.

329. As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees and/or representatives, promised to assist Plaintiffs in applying for and obtaining permanent residence and immigration status for Plaintiffs in the United States, and promised Plaintiffs steady and ongoing work opportunities in the United States with Defendant Signal.

330. These promises were made in exchange for Plaintiffs' payment of fees (including recruitment, immigration application, and travel fees) to Defendants and their employees, agents and/or representatives, and in exchange for Plaintiffs' agreement to work for Signal, Indo-Amerisoft and/or Rao.

331. Plaintiffs paid the agreed upon fees and performed the agreed-upon work.

332. Defendants failed to assist in applying for and obtaining permanent residence and immigration status for Plaintiffs in the United States.

333. Accordingly, money received by Defendants from Plaintiffs, in equity and good conscience, belongs to Plaintiffs.

## NINTH CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

### *(Burnett Defendants)*

334. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

335. Plaintiffs bring this claim against the Burnett Defendants.

336. As set forth in the preceding paragraphs, the Burnett Defendants provided legal assistance to Plaintiffs in applying for and obtaining permanent residence and immigration status for Plaintiffs in the United States.  This included numerous meetings between Plaintiffs and Burnett Defendants, in both India and at Signal's Pascagoula facility, discussing such efforts, correspondence between Plaintiffs and Burnett Defendants regarding such efforts, and a request for, and payment for, legal services for such efforts.

337. By providing legal services and advice on behalf of and to the Plaintiffs, the Burnett Defendants owed fiduciary duties to Plaintiffs, including duties of candor, loyalty, trust, good faith, and special confidence.

338. The Burnett Defendants breached these fiduciary duties to Plaintiffs by, *inter alia*, (i) knowingly making materially false statements and representations to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status in the United States, (ii) failing to disclose to Plaintiffs material information regarding the nature and terms and conditions of both applications and opportunities for immigration status, and employment in the United States, (iii) undertaking non-consensual and conflicting legal representation related to the subject matter of their representation of Plaintiffs.

339. As a direct and proximate result of the Burnett Defendants' breach of their fiduciary duties to Plaintiffs, Plaintiffs have been injured.

## TENTH CLAIM FOR RELIEF

## BREACH OF SPECIAL/CONFIDENTIAL RELATIONSHIP

### (All Defendants)

340. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

341. Plaintiffs bring this claim against all Defendants.

342. As set forth in the preceding paragraphs, Defendants misrepresented to Plaintiffs that they would assist Plaintiffs to apply for and obtain work-based permanent residence and immigration status in the United States, including, *inter alia*: (i) preparation (and mandatory "safe keeping") of certain legal documents purportedly relating to immigration and residency, (ii) arranging travel for Plaintiffs (and, if requested, their families) to the United States, (iii) establishing mandatory personal U.S. bank accounts for Plaintiffs on their behalf in the United States, (iv) arranging for and providing "mandatory" lodging in the United States, and (v) arranging for and providing mandatory food service and/or meal plans in the United States.

343. By providing these services to the Plaintiffs, Defendants had a special, confidential relationship with the Plaintiffs, owing Plaintiffs duties of good faith, candor, loyalty, trust, and fair dealing, as well as an affirmative duty to act on behalf of the plaintiffs' safety, and to protect Plaintiffs from a harm presented or created by someone other than the Defendants. Defendants breached these duties to Plaintiffs by, *inter alia*, (i) failing to comply with their binding promises (as set forth above); (ii) knowingly making materially false statements and representations to Plaintiffs regarding the nature and terms and conditions of both the applications and opportunities for immigration status, and employment in the United States; (iii) failing to disclose to Plaintiffs material information regarding the nature and terms and conditions of both applications and opportunities for immigration status, and employment

63

in the United States; and (iv) failing to provide adequate conditions for Plaintiffs upon their arrival to the United States.

344. As a direct and proximate result of Defendants' breach of this special, confidential relationship with Plaintiffs, Plaintiffs have been injured.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the following relief:

    a.  Declaratory relief;

    b.  Compensatory damages;

    c.  Punitive damages;

    d.  Constructive Trust;

    e.  Accounting of Profits;

    f.  Treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

    g.  An award of prevailing party attorney's fees and costs; and

    h.  Such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: _8/6/2013_

Respectfully submitted,

By: _____

Robert B. McDuff, MS Bar No. 2532
Sibyl C. Byrd, MS Bar No. 100601
Jacob W. Howard, MS Bar No. 103256
767 N Congress St
Jackson, MS 39202
Tel: 601.969.0802
Fax: 601.969.0804
Email: rbm@mcdufflaw.com
Email: scb@mcdufflaw.com
Email: jake@mcdufflaw.com

Anthony N. Upshaw, *pro hac vice* to be filed
Justin B. Uhlemann, *pro hac vice* to be filed
Jeremy Elman, *pro hac vice* to be filed
MCDERMOTT WILL & EMERY LLP
333 Avenue of the Americas, Suite 4500
Miami, Florida 33131
Tel: 305.358.3500
Fax: 305.347.6500
Email: aupshaw@mwe.com
Email: juhlemann@mwe.com
Email: jelman@mwe.com

Steven G. Spears, *pro hac vice* to be filed
Scott W. Clark, *pro hac vice* to be filed
John Low, *pro hac vice* to be filed
MCDERMOTT WILL & EMERY LLP
1000 Louisiana St., Suite 3900
Houston, Texas 77002
Tel: 713.653.1700
Fax: 713.739.7592
Email: sspears@mwe.com
Email: sclark@mwe.com
Email: jlow@mwe.com

*Attorneys for Plaintiffs*